Latrobe Water Co., Appellant, *v.* P. S. C.

Argued May 4, 1934. Before TREXLER, P. J., KELLER, CUNNINGHAM, BALDRIGE, STADTFELD, PARKER and JAMES, JJ.

*Clark O. Tayntor,* and with him *Charles H. English* of *English, Quinn, Leemhuis and Tayntor,* for appellant.

*E. Everett Mather, Jr.,* Assistant Counsel, and with him *Paul H. Rhoads,* and *Samuel Graff Miller,* Legal Assistants, and *John Fox Weiss,* Counsel, for appellee.

OPINION BY CUNNINGHAM, J., October 3, 1934:

Latrobe Water Company has, under its charter, the right and reciprocal duty of supplying water to the public in the borough of Latrobe and the contiguous township of Derry, Westmoreland County. Bradenville is a mining town in that township; it is located along the main line of the Pennsylvania Railroad, a few miles east of Latrobe; for many years the company has supplied water to some of its residents.

The present appeal is by the water company from an order of the public service commission, dated February 21, 1933, directing it, (upon receipt of applications from the acceptance of which it will receive a revenue not less than the amount specified in the order) to make an extension of its facilities in that

community. In support of its contention that the order appealed from is unreasonable and contrary to law, appellant specifies three general grounds: (a) The evidence before the commission was insufficient to justify the order as entered; (b) The revenue from the extension will not give appellant a fair return upon its cost; and (c) The order is unreasonable because it does not require the applicants for service to make deposits along with their applications as a guarantee that service will be taken when the extension is made.

We gather from the record, as preliminary and historical matters, that one of appellant's six-inch mains has extended for some years from Latrobe and along a highway known as the Derry Road to a point referred to in the testimony as Lint's Store; this point is about half a mile west of the village of Bradenville. From the store a four-inch line, belonging to appellant and built in 1914, extends 1,800 feet to a portion of the village. Through it, appellant has been supplying water to 74 consumers, of whom 39 are attached directly to the main, and 35 served by short extensions. The present condition of this four-inch line renders it no longer serviceable, even for the purpose for which it was constructed.

From the end of appellant's six-inch main at Lint's Store, another six-inch main, approximately forty-four years old, extended northwardly and then eastwardly for nearly a mile. It was constructed to serve a coal mine and certain houses designated in the testimony as "old company houses" and has always been privately owned. The present owner, D. John, purchases the water served through this line from appellant at a meter rate amounting to about $85 per month. This line was not kept in repair and in 1931 he gave notice that, unless appellant would furnish water for his houses and a company store and barn through a

connection with a new line, he would be obliged to procure another source of supply.

In July, 1917, a formal complaint, having as its object the extension of service into Bradenville, was filed with the commission. This complaint was dismissed by reason of war conditions, the language of the commission being: "As the respondent in its answer alleges a willingness to make the extensions to furnish water to complainant when the prices of labor and material become normal, no action should be taken now, and the respondent should be given an opportunity to make good the offer set forth in its answer to furnish the service when times are more favorable. The residents of the village are supplied with water from wells and are not, therefore, in immediate need of relief."

No extension having been made during the post-war period, three petitions for an extension of appellant's facilities were filed with the commission—one signed by a committee representing an organization of residents and the others by individuals. They were consolidated for hearing and form the basis for the order now before us.

One of the findings of the commission which appellant has not assigned for error reads: "The present record shows that the coal in the immediate vicinity of Bradenville is about worked out and that, partly as a result of this, most of the wells in the vicinity have become dry, so that during recent drought conditions most of the village has been carrying water from a very small number of wells. The village is entirely without fire protection. There is consequently a very definite need for a public water supply in the village if it can be provided at reasonable cost."

At the first hearing before the commission it was agreed that a conference of the engineering representatives of the parties with the engineering bureau

of the commission should be had. As a result of such conference and of a field study, a proper method of extending the facilities of appellant was agreed upon. In general, it provided for replacing the 1,800 feet of four-inch main above mentioned with an eight-inch line and continuing it an additional distance of 2,411 feet to the corner of High and Depot Streets, with two six-inch branches along other principal streets. The carrying out of the plan adopted by the engineers will involve the laying of approximately 8,400 feet of mains.

The controversy between the parties begins at this point and relates principally to two matters—the cost of making the extension and the probable annual revenue appellant will receive from consumers served by it.

1. Appellant's engineers estimate it will cost $19,-841 to complete the extension in accordance with the approved plan; the engineers for the commission believe it can be done for $18,000. It is stated in appellant's brief that the difference apparently centers in the items for overhead and in the estimated labor rate. The estimate of the commission's engineers was based upon prices prevailing at the date of the second conference—January 5, 1932. They used $35 per ton for pipe delivered at Latrobe and a labor rate of 35 cents per hour; their totals were $9,200 for material, $6,900 for labor and $1,900 for profit and general overhead expense.

By the date of the next conference—March 31, 1932 —the price of pipe had fallen $5 per ton and it was claimed by complainants that labor could be obtained for 25 cents per hour. Appellant's estimate was $10,-116 for material, $5,957 for labor and $3,766 for general overheads.

The finding of the commission upon the cost of the extension reads: "In view of present [February 21,

1933] labor conditions indicated of record, the commission is of the opinion that [appellant] can get the type of labor it seeks at not more than 25 cents per hour. The reduction in this phase of the cost would be ample to offset any increase due to other items which entered [its] estimate. The commission consequently finds that $18,000 is an adequate estimate of the cost of the extension.''

Upon examination of the record, we find thereon sufficient competent evidence to support its finding of the cost of the extension; under all the authorities, applicable to a case of this kind, that is the end of our inquiry upon this question.

2. When we approach the matter of the annual revenue to be expected from the extension, it is important to bear in mind that the order of the commission is contingent upon appellant first receiving applications which will produce a specified minimum revenue. Its text reads: ''That Latrobe Water Company, respondent herein, upon receipt of applications filed in accordance with its current tariff rules for water service to properties abutting on the extension agreed upon in engineering conference on January 5, 1932, from which service respondent would receive in accordance with its tariff now on file a total revenue of not less than $1,392, including therein the seven fire hydrants upon said lines and any coal company houses formerly served by other means, proceed to construct the necessary extension of its facilities'' etc.

Until appellant has received from applicants not now served by it sufficient applications to produce a revenue of at least $1,392, annually, it need not expend any money upon the extension.

Excluding for the present the consumers served from the 1,800 feet of four-inch main (which is to be replaced by an eight-inch pipe), there is evidence that

appellant now has applications from seventy-one individuals and a school for service to properties abutting upon the lines of the proposed extension; to these may properly be added seven fire hydrants (to be paid for by the township) and twenty of the houses owned by D. John on High Street. The figure in the order is arrived at by estimating the 71 domestic applicants at $10 each for the "first draw" and the school at $20, or a total of $730; additional spigots and baths, $182; seven fire hydrants, $280; company houses, $200 —a total of $1,392. Moreover, there are forty-two additional applicants and about fifty company houses not abutting upon, but which can be served by extensions from, the proposed mains. For the purposes of this appeal these may be excluded from the calculation, but they indicate a demand for additional service in the near future.

We have already referred to the thirty-nine consumers now abutting upon and attached to the 1,800 feet of four-inch main; the annual revenue now received from them, exclusive of that from the thirty-five served by extensions, is $407. When this is added to the expected new revenue, the total anticipated from the contemplated replacement and extension will be $1,799. It should also be noted that appellant faces a loss of revenue of $1,000 a year from the John properties if the extension is not made.

The only question remaining, under this branch of the case, is whether this amount will be a fair return upon an expenditure of $18,000. There is little room for argument upon this point. The revenue immediately anticipated is ten per cent of the expenditure.

Appellant through its accountant, M. H. Parkinson, put in evidence its exhibit "G," showing its "Fixed Capital, Less Reserve for Depreciation"; "Operating Revenues"; "Operating Expenses"; "Operating In-

come"; and "Percent Return"—covering the eleven years, 1921-1931. The witness testified that the "fixed capital" item is "a valuation figure as set up on the books," and that the "operating expenses" include taxes and depreciation. The exhibit shows, for the year 1931, a valuation of $1,543,594; operating revenues of $104,699; operating expenses of $36,620; operating income of $68,079; and a per cent return of 4.41. The commission was justified in finding that appellant's operating expenses are, and for some years have been, approximately one-third of its revenue, and that the return upon the cost of the extension will be about 6.7%—a figure considerably higher than its present return upon its own valuation of its existing property.

3. The final contention of appellant is that the order is unreasonable because it does not require the new applicants to make deposits as a guarantee that they will take the service. This contention is fully answered in the brief for the commission in this manner:

"There is undoubtedly a situation involving some difficulty which confronts public utilities making extensions. People do request service and then when the extension is made and the company's money spent do not always take the service. The commission is not at all oblivious of the problem. On the other hand, a number of utilities have put provisions in their general tariffs by which it is required that when service is applied for at locations which necessitate the company extending its facilities to an extent more than the mere laying of a service pipe or some other minimum construction, the application shall be accompanied by a cash deposit equal to a year's minimum bill or some similar amount. The situation is directly parallel with that which would exist if an applicant

sought service on an existing line and the company requested that he put up a deposit to insure the payment of bills. The latter rules have frequently been passed upon by the commission and if reasonable in their details, have uniformly been approved. Appellant apparently has no provision in its tariff regulations protecting it from applicants who say they want service and then withdraw from their commitments. It would seem to lie within appellant's power to protect itself by such a general tariff provision dealing with all extensions. ...... The order of the commission has left the way open for appellant to do this if it sees fit, in that it says that the extension is to be made '...... upon receipt of applications filed in accordance with its current tariff rules......'."

In our opinion, there is ample competent evidence upon the record before us to support the findings of the commission. The contingent order based upon these findings seems to us to be entirely reasonable and in conformity with law.

Appeal dismissed and order affirmed.